UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LARRY ATKINS, Petitioner | ) | |
| v. | ) | Civil Action No. 08-30031-MAP |
| HAROLD W. CLARKE, Respondent | ) | |

REPORT AND RECOMMENDATION REGARDING PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS (Document No. 1)
April 16, 2010

NEIMAN, U.S.M.J.

In this action, Larry Atkins ("Petitioner") -- a state inmate serving between three and four years for unlawful possession of a firearm in violation of Mass. Gen. L. ch. 269, § 10(a) and unlawful possession of a firearm or ammunition without an identification card in violation of Mass. Gen. L. ch. 269, § 10 (h) -- seeks *habeas corpus* relief pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Petitioner asserts that his conviction by a Massachusetts jury on May 9, 2005, resulted from ineffective assistance of counsel in violation of the Sixth Amendment. For the reasons indicated below, this court will recommend that the petition for a writ of *habeas corpus* be denied.

## I. BACKGROUND

There is no dispute as to the facts leading to Petitioner's arrest. These facts are summarized in the Superior Court's January 31, 2007 Memorandum of Decision and Order:

On July 25, 2004, an anonymous individual called 911 and reported that a man wearing a white football jersey had a gun on Terrence Street in Springfield. In response to this call, the Springfield Police Department sent out a dispatch to the patrol car, "foxtrot two," assigned to Terrence Street. Officers Garafolo and Starr, who were assigned to foxtrot two, responded. When they arrived at Terrence Street, they saw a vehicle on the west side of the street quickly pull away. Assuming that the vehicle observed was pulling away from their presence, the officers pursued and stopped it approximately two blocks from Terrence Street.

Upon hearing the dispatch, Officers Provost and Zarelli, who were assigned to an adjacent district served by the "foxtrot one" patrol car, went to Terrence Street to support foxtrot two. They slowly drove south on Terrence Street, looking for either foxtrot two or a man in a white football jersey. Zarelli, the passenger, was looking to his right toward the west side of the street. As foxtrot one passed a white house, Zarelli saw two men standing in the driveway. One of the men was wearing a white football jersey and holding a purple bag. Zarelli saw this man turn his head toward the street as the patrol car passed him. After Zarelli lost sight of the men, he told Provost what he had seen. Then, Provost and Zarelli heard over the radio that foxtrot two had made a stop, and they proceeded to that location. Neither of the two people in the vehicle stopped by foxtrot two was wearing a white football jersey. Zarelli informed Starr and Garafolo that he had seen a man wearing a white football jersey and all four decided to return to Terrence Street.

When the officers went back to the driveway on Terrence Street, they observed three individuals toward the rear of the driveway, one of whom was the defendant, who was wearing a white football jersey, but was no longer holding a purple bag. The officers secured the individuals and three of the officers started to look around the area for the purple bag that Zarelli [had] seen. Garafolo looked through large holes in a dilapidated garage at the end of the driveway and observed a purple bag with the butt of a gun protruding. He also observed ammunition scattered around the bag. He reached through the hole in the garage and retrieved the bag and the ammunition. At that point, the officers arrested the defendant. The police later determined

> that the bag contained a loaded .22 caliber revolver and the ammunition was a mix of live .22 caliber long and Magnum cartridges.

(Supplemental Answer ("S.A.") I at187-88.)

On May 2, 2005, the trial judge held a pretrial hearing during which she considered a motion *in limine* filed by Petitioner's counsel (hereinafter "Trial Counsel") objecting to the use of the 911 call as hearsay. (S.A. I at 188.) At first, the trial judge stated as follows:

> But the police are entitled -- the Commonwealth is entitled to let the jury know why they responded or why they behaved in a certain manner, what the basis of their actions were. So I think that [Respondent] would be entitled just to have, to ask the question of whatever officer . . . .

(S.A. I at 188-89.) In response, Trial Counsel stated, "Judge, if you will allow that, I would ask you to play the tape." (S.A. II at 82.) After a brief discussion on how the tape might be admitted, Trial Counsel again insisted that "[i]f you will mention it through the officer, I think we should hear the tape." (S.A. II at 83.) The Prosecutor then entered the conversation regarding the use of the information:

> [PROSECUTOR]: Okay, I'm going -- if I should argue for this -- well, I was going to limit it to the contents of the dispatch.
>
> THE COURT: And the dispatch was: Respond to Terrence Street.
>
> [PROSECUTOR]: For a man in a white football jersey with a gun.
>
> THE COURT: What does the 911 tape say?
>
> [PROSECUTOR]: I think that's pretty much it, except that it's a person calling who didn't identify himself.
>
> THE COURT: Do they say, I saw a man in a white football jersey with a gun?

> [PROSECUTOR]: There's a man sitting on a porch in a white football jersey with a gun.

(S.A. II at 83-84.)

Once it had been agreed that the dispatch referred to a man wearing a white football jersey on Terrence Street, the judge asked the Prosecutor if he would stipulate to the admissibility of the tape and he agreed. (S.A. II at 84.) Trial Counsel then requested that the tape be played during his opening statement for the purpose of allowing "the jury [to] understand what was said and what the evidence will show." (S.A. II at 85.)

On May 4, 2005, before the first day of trial began, the Prosecutor again raised the issue of the 911 tape:

> [PROSECUTOR]: I can think of no non-hearsay purpose for the tape to be offered, at least -- especially the tape of a call. So I simply want to put on the record that it's my understanding that [Trial Counsel] wishes this tape to be introduced for some strategic purpose known only to him at this point.
>
> THE COURT: And you're not objecting to the introduction of the tape? The use of the tape?
>
> [PROSECUTOR]: I'm not objecting to the introduction of the tape but I can think of no non-hearsay purpose for this tape, which is -- at least the call, I believe, is a piece of hearsay.
>
> THE COURT: Okay. [Trial Counsel]?
>
> [TRIAL COUNSEL]: Yes, Judge. I do want to play the tape. . . .
>
> . . . .
>
> [PROSECUTOR]: So otherwise -- in that case, then, I have -- I am simply making a record about this. Otherwise I don't believe that -- if I had attempted to introduce this tape, I

> believe -- and [Trial Counsel] objected, I believe the tape at least of the call would be out.
>
> THE COURT: I agree, but since the defendant wants it in –
>
> [TRIAL COUNSEL]: Yeah, Judge.
>
> THE COURT: -- we'll let it in.

(S.A. II at 103-05.)

As the trial judge later indicated, the tape was in fact used by both the prosecution and the defense during the trial:

> In his opening and closing, the prosecutor mentioned that the police were dispatched in response to an anonymous 911 call that indicated that a male wearing a white football jersey was sitting on a porch with a gun on Terrence Street. The prosecutor introduced the tape into evidence during the testimony of the first witness, Zarelli, after asking if he had heard the tape of the 911 call and the dispatch and if the dispatch was what he had heard on July 25, 2004. [Trial Counsel] indicated that he had no objection and did not request a limiting instruction that the call could not be used as substantive evidence. In his opening statement, cross-examination, and closing argument, [Trial Counsel] tried to use the tape of the 911 call to impeach the police officers, their testimony being crucial to the Commonwealth's case, by showing that they embellished the contents of the dispatch, as well as to argue that the caller's tone and hesitation when asked to describe the man with the gun suggested uncertainty. [Trial Counsel]'s ongoing themes were that there was no direct evidence of the defendant's guilt. The court provided the jury with the tape of the call and a tape player during deliberations.

(S.A. I at 189-90.) On May 9, 2005, a jury, as indicated, convicted Petitioner of unlawful possession of a firearm and unlawful possession of ammunition without a firearm identification card. (S.A. I at 186.)

On April 19, 2006, Petitioner, represented by new counsel, moved for a new trial under Mass. R. Crim. P. 30(b), arguing that Trial Counsel was ineffective when he requested that the

tape of the 911 call be played and when he failed to object to the tape during trial and seek a limiting instruction regarding the contents of the call. (S.A. I at186, 190.) Petitioner also requested an evidentiary hearing. (S.A. I at 186.)

On January 31, 2007, the trial judge issued her Memorandum of Decision and Order. Addressing whether the decision by Trial Counsel to use the tape had been unreasonable and whether, assuming it was unreasonable, Petitioner had been prejudiced, the judge found such use neither unreasonable nor prejudicial:

> It is clear to this court that [Trial Counsel]'s actions with regard to the tape were not manifestly unreasonable at the time they were made. [ Trial Counsel]'s motion in limine demonstrates that he had thought about the problematic aspects of the 911 call. During the pre-trial hearing, [Trial Counsel] decided to take a different strategic approach and requested that the tape of the 911 call be played in its entirety. . . . Whether or not the content of the 911 call was inadmissible hearsay, this court rules that [Trial Counsel]'s tactical decisions were not manifestly unreasonably at the time they were made.
>
> Moreover, even if [Trial Counsel]'s strategic approach were unreasonable, given the strength of the Commonwealth's case, the [Petitioner] has not shown that better work might have accomplished something material for the defense.

(S.A. I at 193-94 (citations omitted).)

On February 26, 2007, Petitioner appealed the decision to the Massachusetts Appeals Court. On December 3, 2007, the Appeals Court affirmed stating, in part, the following:

> After the judge reviewed the attorney's actual use of the 911 call and recited the standards to be applied by her in deciding a motion for a new trial, she concluded that the attorney's actions with regard to the tape were not manifestly unreasonable at the time they were made. We agree with the judge and rely upon the careful reasoning and appropriate authorities she cited.

(S.A. I at 322.) On January 31, 2008, the Massachusetts Supreme Judicial Court ("SJC")

denied further appellate review. (S.A. I at 386.)

The matter then moved to this forum. On February 13, 2008, Petitioner filed the instant petition for a writ of *habeas corpus*. The petition was dismissed nearly a year later on January 27, 2009, for want of prosecution. On January 30, 2009, however, Petitioner filed a motion for reconsideration requesting that the petition be reinstated, which motion was soon granted. Then, on May 19, 2009, Petitioner filed a motion for an evidentiary hearing, which this court denied. In doing so, this court found that Petitioner

> has not given any inkling what evidence he might produce at the hearing, or described in any way how that evidence might fit into his ineffective assistance of counsel claim, or pointed to specific facts that the hearing is likely to elicit support for his allegations, or, most significantly, posited how any such evidence would overcome the statute's deference to the state court's factfindings and legal conclusions.

(Memorandum and Order (Document No. 22) at 8.) The court indicated further that, while Petitioner was not statutorily barred from having an evidentiary hearing, he had not met the "stringent discretionary standard" with which such motions are reviewed. (*Id.* at 7-8.) Petitioner's motion for reconsideration was thereafter denied by District Judge Michael A. Ponsor. Presently before the court is Petitioner's underlying petition for a writ of *habeas corpus*, which also includes (in Petitioner's brief) a renewed request for an evidentiary hearing.

## II. STANDARD OF REVIEW

Under the AEDPA, a federal court may grant *habeas corpus* relief only if the petitioner establishes that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state-court decision is "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the

governing law set forth in" Supreme Court cases, or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state-court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

Even if a state-court decision involves an unreasonable application of Federal law, however, the petitioner must show that the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Foxworth v. St. Amand*, 570 F.3d 414, 425 (1st Cir. 2009) (citation and internal quotation marks omitted). Finally, "[e]ven where the petitioner presents facts that make the state court's determination a close call, the federal court must give deference to the state court." *Jimenez v. Spencer*, Civil Action No. 07-12242-DPW, 2009 WL 2145803, at *4 (D. Mass. July 14, 2009).

## III. DISCUSSION

Petitioner alleges that the Massachusetts courts erred in deciding that his Trial Counsel was not constitutionally ineffective. In essence, Petitioner maintains that Trial Counsel (1) "misapprehended the governing law on evidence and Confrontation," (2) "misunderstood the trial judge's evidentiary rulings" and (3) "based upon those errors, introduced into evidence the most damaging evidence against his own client." (Pet'r's Memorandum in Support of Habeas Relief at 1.) For the reasons discussed below, however, the court concludes that *habeas corpus* relief is not warranted and, accordingly, recommends that the petition be denied. The court separately addresses Petitioner's underlying ineffective assistance of counsel claim and

his renewed request for an evidentiary hearing.

A. Ineffective Assistance of Counsel

Petitioner first argues that, under the test set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), Trial Counsel was ineffective in violation of his Sixth Amendment right to counsel and that the state courts' decisions were unreasonable when they found otherwise. The court disagrees.

Under *Strickland*, a petitioner must show both that an attorney's performance was deficient and that his defense was thereby prejudiced. *Id.* at 687. With respect to performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. With respect to prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The court first considers the deficiency issue and then turns to prejudice.

1. *Deficiency*

Petitioner alleges that Trial Counsel was constitutionally defective in three discrete ways. First, Petitioner alleges that Trial Counsel's performance at the hearing for the motion *in limine* demonstrated a lack of familiarity with *Crawford v. Washington*, 541 U.S. 36 (2004), which addressed when "admission of certain hearsay statements violates [an] accused's right to confront witnesses." *Horton v. Allen*, 370 F.3d 75, 83 (1st Cir. 2004). Second, Petitioner alleges that Trial Counsel's decision to use the 911 call was based on the erroneous assumption that the trial court had already ruled the call admissible. Third, Petitioner alleges that, given the marginal impeachment value associated with the call, Trial Counsel's choice to use it cannot be considered objectively reasonable. The court addresses each of these

assertions in turn.

a. The Impact of *Crawford v. Washington*

In *Crawford*, the Supreme Court held that "testimonial" statements were inadmissible against a criminal defendant unless the defendant had been given the opportunity to confront the declarant. *Id*., 541 U.S. at 68-69. Here, Plaintiff argues, the 911 call was barred not only by the hearsay rule but, as well, by the confrontation clauses in the federal and state constitutions. Accordingly, Petitioner asserts, Trial Counsel's performance was deficient by not knowing, let alone acknowledging, the import of *Crawford*.

In the court's opinion, Petitioner's argument falls short. As noted by the trial court in its January 31, 2007 Memorandum of Decision and Order, the SJC has held that the contents of a 911 call are non-testimonial statements when they relate to an ongoing emergency and, therefore, do not implicate the confrontation clause under *Crawford*. *See Commonwealth v. Galicia*, 857 N.E.2d 463, 470 (Mass. 2006). Petitioner, however, fails to address the *Galicia* decision or, more importantly, its Supreme Court equivalent, *Davis v. Washington*, 547 U.S. 813 (2006), both of which indicate that the 911 call here would not have implicated Petitioner's confrontation clause rights. In *Davis*, the Supreme Court determined that a declarant's statement during a 911 call was non-testimonial where the caller's "primary purpose was to enable police assistance to meet an ongoing emergency" rather than to act simply as a witness or testify. *Id.* at 827-28. In the case at bar, the transcript of the 911 call displays an obvious intent to alert police to an ongoing emergency, a male sitting on a porch with a gun. Because the confrontation clause was likely not implicated by the 911 call, it was not unreasonable for Trial Counsel to fail to raise a confrontation clause objection.

b. Whether There was an Erroneous Understanding of Trial Judge's Ruling

Petitioner next argues that Trial Counsel did not make a reasonable strategic decision regarding use of the 911 call because his decision was based on a mistaken impression that the trial judge had already ruled the call admissible. The record reflects, however, that during the pre-trial conference Trial Counsel insisted repeatedly that *if* information from the call was going to be admitted through Police Officer testimony, then the *entire* call should be admitted. (S.A. II at 82-83.) While the actual scope of testimony that the trial judge would have allowed is unclear, the Prosecutor did indicate during the pre-trial conference that his intention was to limit the officer's testimony to the contents of the dispatch, described as including information regarding "a man in a white football jersey with a gun." (S.A. II at 84.) Later, just prior to trial, the Prosecutor made clear that it was the defense and not the prosecution that wanted the tape admitted "for some strategic purpose known only to [Trial Counsel] at this point." (S.A. II-104-05.) Trial Counsel confirmed that he wanted the call to be played. (S.A. II-105.) This can hardly be deemed an error of understanding on the part of Trial Counsel.[1]

As the trial judge later found, there was nothing in the record which indicated that Trial

---

[1] Indeed, the Prosecutor's motivation for clarifying the use of the 911 tape may have been an attempt on his part to prevent a misunderstanding that would result in a new trial. Regarding a separate incident where the Prosecutor questioned Trial Counsel's strategy, the following discourse occurred:

> [PROSECUTOR]: I think I probably should protect this defense attorney from himself on this . . . . I don't want to do this trial a second time.
>
> THE COURT: We're not going to do the trial a second time. He is an experienced defense lawyer. If he wants to open the door to this --
>
> [PROSECUTOR]: Thank you, Your Honor.

(S.A. II at 310-11.)

Counsel had been confused during the pre-trial conference. If anything, the trial judge determined that Trial Counsel had made a knowing strategic decision. (S.A. I at 193 ("During the pre-trail hearing, [Trial Counsel] decided to take a different strategic approach and requested that the tape of the 911 call be played in its entirety.").) Indeed, during the pre-trial conference Trial Counsel articulated a particular strategic use of the tape, namely, to impeach a police officer who had testified erroneously before the grand jury that the dispatch had been for a "black male" when, in fact, no race had been articulated. (S.A. I at 193; S.A. II at 85.) Trial Counsel's actions during the trial demonstrated yet another use of the 911 tape, *i.e.*, to undermine the credibility of the 911 caller by emphasizing the caller's tone and hesitation when identifying the individual. (S.A. I at 193.)

To be sure, Trial Counsel later submitted an affidavit where he stated, erroneously it appears, "[p]ursuant to the referenced ruling by [the trial judge], the 911 tape was allowed into evidence." (S.A. I-123.) This affidavit was submitted more than a year after the original hearing. This court finds entirely more probative the transcript of the conversation that occurred at the hearing itself, as opposed to representations later made by Trial Counsel, erroneous or otherwise. In any event, the question presently before this court is whether Trial Counsel made a reasonable strategic decision at the time of the hearing and trial. That certainly appears to be so. In short, Petitioner has failed to persuade this court that the trial judge's determination -- that Trial Counsel made a consistent, repeated, strategic decision to play the call -- was in error.

c. Whether a Strategic Decision to Use the Tape Was Objectively Reasonable

Finally, Petitioner argues that, even if Trial Counsel's decision to play the 911 tape was strategic, it was patently unreasonable. *See Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000)

("The relevant question is not whether counsel's choices were strategic, but whether they were reasonable."). Specifically, Petitioner argues that the decision to use the tape was unreasonable because it provided highly inculpatory evidence for the prosecution but had limited impeachment value for the defense. In particular, Petitioner points to the prosecution's emphasis on the "white football jersey" evidence at trial as indicative of just how truly inculpatory was the evidence. Again, the court disagrees.

First, as the trial judge found and the Appeals Court agreed, "[i]t is clear . . . that [Trial Counsel]'s actions with regard to the tape were not manifestly unreasonable at the time they were made." (S.A. I at 193, 322.) This determination was made based both on what Trial Counsel purported would be his use of the 911 tape, *i.e.*, to impeach police officers' credibility, and his actual use of the tape at trial. (S.A. I at 193.) Thus, Trial Counsel used the 911 tape both to impeach Officer Garafolo – whose Grand Jury testimony had erroneously identified a racial component to the dispatch -- and to undermine the caller's identification of the targeted individual based on tone and hesitation. (*Id*.)

In fact, the trial judge later rejected Petitioner's subsequent argument that impeaching the police officers was of limited value, finding that "[t]he police officers' credibility was vital to the Commonwealth's case." (*Id*.) Further, given Trial Counsel's reasonable anticipation -- in light of the conversation between the trial judge, Trial Counsel and the Prosecutor at the pre-trial hearing -- that at least some of the contents of the police dispatch would be introduced into evidence through police officer testimony (see S.A. I at 188-89), the decision to impeach the police officers through use of the 911 call cannot be said to have been objectively unreasonable.

Finally, as the Supreme Court explained in *Strickland*, "[j]udicial scrutiny of counsel's

performance must be highly deferential. *Id.*, 466 U.S. at 689. According to the Court, "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* Here, given the level of deference under the AEDPA afforded not only trial counsel but the state courts as well, this court believes that Petitioner has not met his burden of demonstrating that Trial Counsel's decision to use the 911 call was objectively unreasonable.

2. *Prejudice*

Even were Petitioner to adduce evidence sufficient to show ineffective assistance of counsel, he needs to show that there was a "reasonable probability" that such assistance of counsel resulted in prejudice. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "This is a 'highly demanding' and 'heavy burden.'" *Knight v. Spencer*, 447 F.3d 6, 15 (1st Cir. 2006) (quoting *Williams*, 529 U.S. at 393). For the reasons which follow, this court believes that Petitioner has failed in the endeavor.

For one thing, the trial judge specifically determined that there was no reasonable probability of prejudice:

> [E]ven if [Trial Counsel]'s strategic approach were unreasonable, given the strength of the Commonwealth's case, the defendant has not shown that better work might have accomplished something material for the defense. The Commonwealth's evidence that a police officer observed a man wearing a white football jersey holding a purple bag in a driveway and, within a few minutes, the police recovered a purple bag containing a gun and ammunition from a garage near the defendant, who was wearing a white football jersey, undermines the defendant's argument that the caller's identification of a man wearing a white football jersey prejudiced him.

(S.A. I at 194 (citations omitted).)[2] Nonetheless, Petitioner appears to assume that Trial Counsel's use of the 911 tape opened the door for the "white football jersey" reference and that, without it, no such evidence would have been available. This is not quite accurate.

Trial Counsel's decision to use the 911 call was made after the trial judge had indicated that the prosecution would be entitled to ask questions of a testifying officers regarding the contents of the dispatch in order "to let the jury know why they responded or why they behaved in a certain manner." (S.A. I at 188-89.) Granted, the exact scope of the testimony which would have been allowed is unclear. But the Prosecutor had stated that he planned to elicit the officers' testimony as to the contents of the dispatch, *i.e.*, a Terrence Street "man in a white football jersey with a gun," and the need to respond thereto. (S.A. II at 84.) Accordingly, excluding the 911 tape itself would not necessarily have prevented the inclusion of the "white football jersey" reference that Petitioner now asserts prejudiced his defense. Petitioner's argument also fails to take into account that Officer Zarelli had observed, independent of the 911 call, "a man wearing a white football jersey holding a purple bag in a driveway," a purple bag which was later found to contain a gun. (S.A. I at 194.) The 911 call, therefore, was not the only evidence linking the white football jersey and the gun.

In sum, because Petitioner has not met the "heavy burden" of showing that inclusion of the 911 tape prejudiced his case such that it is reasonably probable to have affected the outcome, the decision of the trial judge was not unreasonable and is entitled to deference. As

[2] The Appeals Court, it should be noted, did not reach the issue of prejudice because, in its view, Petitioner had failed to show ineffective assistance of counsel. (S.A. I at 322.) *See generally Knight*, 447 F.3d at 15 ("A defendant's failure to satisfy one prong of the *Strickland* analysis obviates the need for a court to consider the remaining prong.").

a result, and for the other reasons stated above, this court has little choice but to recommend that the petition for *habeas corpus* relief be denied.

B. Evidentiary Hearing

Petitioner also asserts that it was error for this court not to provide him with an evidentiary hearing to further explore Trial Counsel's motivation in playing the 911 tape. In support, Petitioner calls the court's attention to a recent decision by the Supreme Court, *Wellons v. Hall*, 130 S. Ct. 727 (2010). Unfortunately for Petitioner, that decision adds nothing to the argument he previously pursued.

In *Wellons*, the Supreme Court addressed whether the Eleventh Circuit had erred in failing to even address whether a petitioner had been entitled to an evidentiary hearing where the record before the court had been based on "speculation" and "surmise." *Id.* at 729-30. Here, in contrast, there is a full evidentiary record. To be sure, Petitioner, again, would like a hearing to flesh out Trial Counsel's motivation in playing the 911 tape. But the court already has had available to it the trial transcript -- wherein, as described, Trial Counsel made use of the 911 tape -- as well as the transcript of the hearing in which counsel justified his decision and a later transcript where counsel affirmed that decision. Simply put, this is not a case where a federal court is deferring "to state-court factual findings, made without an evidentiary record." *Id.* at 730 n.3. If anything, just the opposite is true.

## III. CONCLUSION

For the reasons stated, the court recommends that Petitioner's petition for a writ *habeas* (including his renewed request for an evidentiary hearing) be DENIED.[3]

---

[3] The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of

DATED: April 16, 2010

/s/ Kenneth P. Neiman
KENNETH P. NEIMAN
U.S. Magistrate Judge

---

Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within fourteen (14) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980). *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.